Van Brunt, J.
Before directly considering the questions raised in this action, it will be of advantage to briefly consider the laws relating to telegraph companies, and under which such companies could be organized and which were in existence in the year 1877.
The first act is chapter 256 of the Laws of 1848, by the provisions of which the companies organized under it were granted corporate powers 1 c for the purpose of constructing a line of wires of telegraph through this State, or from or to any point within this State,” with power to purchase, receive, and “ to hold and convey such real estate and such only as may be necessary for the convenient transaction of the business, and for effectually carrying on the operations of such association; ” power to construct lines of telegraph along and upon any of the public roads and highways or across any of the waters within the limits of this State ; ” and power to “increase the capital stock and the number of the association,” and it was required to receive and transmit from and for other telegraph companies and from and for the public on payment of the usual charges therefor.
The next act passed by the Legislature was chapter 98 of the Laws of 1851, by which the directors or *218 trustees of any telegraph company formed under the preceding act, were empowered at any time with the written consent of the persons owning two-thirds of the capital stock of said company, to extend their lines of telegraph, or construct branch lines to connect with their main line, or to unite with any other incorporated telegraph company.
The next act is chapter 471 of the Laws of 1853. By this act telegraph companies, upon complying with the requirements of that act, were granted corporate powers “for the purpose of owning or constructing, using or maintaining a line or lines of electric telegraph, whether wholly within or partially beyond the limits of this State ; or for the purpose of owning any interest in any such line or lines of electric telegraph or any grants therefor;” and it was empowered and “ authorized to erect and construct from time to time, the necessary fixtures for such lines upon, over or under any of the public roads, streets or highways; and through, across and under any of the waters within the limits of this State ; ” and “also to erect and construct such fixtures upon, through or over any other land, subject to the right of the owner or owners thereof, to full compensation for the same,” and with power of condemnation in case no agreement can be made with such owners as to the amount of such compensation.
The next act is chapter 425 of the Laws of 1862, which provides as follows: “Any telegraph company which is duly incorporated under and in pursuance of the act entitled “ An act to provide for the incorporation and regulation of telegraph companies, passed April 12, 1848, may construct, own, use and maintain any line or lines of electric telegraph not described in their original certificate of organization, whether wholly within or wholly or partially beyond the limits *219 of this State, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining such line or lines, and may own and hold any interest in such line or lines, and may become lessees of any such line or lines upon the terms and conditions and subject to the liabilities prescribed in such act, so far as such provisions are applicable to the construction, using, maintaining, owning or holding of telegraph lines or any interest therein, pursuant to the provisions of this act.”
And it is further provided, that any telegraph company availing itself of the provisions of the act shall file a certificate with the secretary of state executed by at least two-thirds of the directors, within one year.
The next act is chapter 568 of the Laws of 1870, which is as follows : “In order to perfect and extend the connections of telegraph companies in this State, and to promote their union with the telegraph systems of other States, any telegraph company organized under the laws of this State, may lease, sell, or convey, its property, rights, privileges and franchises or any interest therein, or any part thereof, to any telegraph company organized under, or created by, the laws of this or any other State, and may acquire by lease, purchase or conveyance, the property rights, privileges and franchises, or any interest therein, or any part thereof, of any telegraph company organized under or created by the laws of this or any other State, and may make payments thereof in its own stock, money or property, or receive payment therefor in the stock, money or property of the corporation to which the same may be sold, leased or conveyed; provided, however, that no such purchase, sale, lease or conveyance by any corporation of this State shall be valid until it shall have been ratified and approved by a three-fifths vote of its board of directors or trustees, *220 and also by the consent thereto in writing or by vote, at a general meeting duly called for the purpose, of three-fifths in interest of the stockholders in such com-pan v, present or represented by proxy at such meeting.”
What arrangements two telegraph companies could make in reference to the conduct of their business which would not be protected and come within the scope or meaning of the foregoing acts, I am totally at loss to imagine. They may consolidate ; they may construct, maintain and use lines of telegraph not mentioned in their original certificate of incorporation; they may jointly construct, lease, own and use such lines ; they may lease, sell or buy telegraph property, rights, privileges and franchises, or any interest therein or any part- thereof, paying and receiving in payment therefor stock, money or property.
It would seem to have been the intention of the Legislature to give to telegraph companies the power to make any and all arrangements for the conduct of their business, either jointly or separately, which natural persons could possibly enter into, requiring, in some instances, to such arrangements, the consent of three-fifths or two-thirds, as the case may be, of the directors and stockholders of the corporation.
Such being the intent of the Legislature, as is abundantly evidenced by the broad and general language of the acts above referred to, it would be difficult to say that any arrangement for the conduct of their business which might be entered into between two telegraph companies could be ultra vires if duly assented to by their stockholders, provided the same was not clearly against public policy.
Even apart from these acts of the Legislature, extending, as they do, so largely the powers of telegraph corporations, I am entirely unable to see that, in case the Western "Union and the Atlantic and Pacific Telegraph Company had constructed lines of telegraph, *221 and were maintaining separate offices in any given places, which could not afford sufficient business for both, an arrangement by which one of these companies should shut up its office and connect its wires with the office of the other company, and by which the receipts and expenses of this office should be divided, would be ultra ñires.
It might be urged that such an arrangement would be against public policy, but it is certainly valid unless some such consideration intervenes. It is simply a business arrangement, relating to the manner in which their business is to be conducted. Instead of hiring two offices, they hire one and divide the expense. The same as to clerk hire, and the other expenses incident to the maintaining the station. They then divide the receipts in a proportion which their previous experience has ascertained to be equitable.
In the absence of any legislation, it might be argued, as I have said, that such arrangements were against public policy, as tending to prevent competition ; but in view of the legislation which authorizes the consolidation of these corporations ; the purchase and sale of their franchises ; the joint construction and use of telegraph lines, all of which tend to prevent competition, it cannot be said that any such public policy is countenanced by the Legislature of this State.
The arrangements which have been carried out between the defendants are nothing but an amplification of the instance which I have above given.
It is true that the resolutions of August 20, 1877, do not seem to contemplate the abandonment of any offices of either company, but in this action it is necessary to consider what has been done in carrying out the intent of the company to prevent ruinous competition.- I do not think the arrangement made between the defendants comes within the provisions of the act of 1870, because neither of these companies, it seems *222 to me, has acquired any interest in the property, .rights, privileges and franchises of the other; and it is to be noticed that any material part of the arrangements between the defendants, the division of the expenses has never been acted upon by the stockholders of the Western Union Telegraph Company, which would be essential, if the agreements between the two companies came within the provisions of the act of 1870.
It being, therefore, the evident intention of the Legislature to give to telegraph companies such large and ample powers, and no arrangement which they may make to prevent competition which would be ruinous to each, being against public policy, there is nothing in the action of the two defendants, such action being manifestly for the interest of all persons concerned, which calls for the intervention of the court.
The majority of the stockholders being so large in favor of the action of the defendants, the court should not interfere at the instance of the holder of one hundred shares out of over 350,000, unless a clear case” is made out for such intervention.
I think, therefore, that the action of the defendant, the Western Union Telegraph Company, was not ultra vires, neither is it against public policy, and the plaintiff’s complaint must therefore be dismissed, with costs.